# WELCH & SMITH, P.C.

### LAWYERS
6440 AVONDALE DRIVE
SUITE 206
OKLAHOMA CITY, OK 73116
TELEPHONE: (405) 286-0801
FACSIMILE: (405) 286-0301
E-MAIL: WS@WELCHSMITH.COM

MORT G. WELCH
MWELCH@WELCHSMITH.COM

SHERRY L. SMITH
SSMITH@WELCHSMITH.COM

November 1, 2010

Kelly@thewestlawfirm.com
Gregg W. Luther
The West Law Firm
124 W. Highland
P.O. Box 698
Shawnee, OK 74802-0698

RE:    *Tate v. Allstate Insurance Company,* Case No. 5:10-CV-104-R, United States
       District Court, Western District of Oklahoma

Dear Mr. Luther:

This report is submitted pursuant to Rule 26(a)(2)(B), Federal Rules of Civil Procedure, in my capacity as an expert witness on behalf of your client, Greg Tate, in the case referenced above. I will refer to the defendant Allstate Insurance Company as AIC.

## I.   EDUCATION.

I received a bachelor of arts degree with special distinction from the University of Oklahoma in 1972. I received a juris doctorate degree from the University of Texas School of Law in 1975.

## II.  EXPERIENCE AND QUALIFICATIONS.

I have been continuously engaged in the practice of law, almost exclusively in civil law matters since 1975. I was employed in 1975 and 1976 by a general practice law firm in Harlingen, Texas. From 1976 to 1978, I was an associate with Cooper, Stewart, Elder and Abowitz, in Oklahoma City, a civil litigation firm which handled many cases involving bodily injury tort and insurance claims. In 1978 I was a founder of Abowitz and Welch, and was a shareholder in this law firm, later known as Abowitz, Welch and Rhodes, until 1995. In 1995, I was a sole practitioner. In 1996 I formed another law firm, Welch, Jones & Smith, with Laurie W. Jones and Sherry L. Smith. In 2000 this firm became Welch and Smith, when Ms. Jones became a full-time teacher at the Oklahoma City University School of Law.

My practice since 1976 has consisted of civil litigation of all types, with emphasis on insurance coverage and insurance bad faith cases, and advising insurers, insureds, lawyers and public adjusters concerning rights and obligations under insurance policies. This advice has

EXHIBIT

1

November 1, 2010
Page 2

resulted in the preparation of over a thousand written opinions concerning a wide variety of issues arising as a result of claims made under insurance policies. I also have reviewed and approved preparation of numerous insurance coverage opinions by other lawyers. I have also prosecuted and defended multiple insurance bad faith, breach of insurance contract and declaratory judgment action cases, including cases arising out of uninsured motorist (UM) claims, on behalf of insurers and insureds.

My experience in insurance litigation and as an advisor to insurers, insureds, lawyers and public adjusters has allowed me to address a wide variety of issues under the following policies: personal and business auto, homeowners, dwelling, farmowners, workers compensation and employers liability, professional liability, directors and officers liability and corporate indemnification, commercial general liability, commercial property, personal and commercial umbrella, and reinsurance contracts. I have drafted insurance policy provisions and revised other provisions. I have personally supervised hundreds of investigations of claims and personally conducted such investigations, including UM claims. I have trained adjusters and their supervisors concerning claims investigation techniques and procedures, the construction and interpretation of insurance policies, insurance case and statutory law, evaluation of bodily injury claims, and standards for claims handling intended to comply with the covenant of good faith and fair dealing, both with respect to UM claims and other insurance claims. I have evaluated thousands of claim files for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages, and whether the investigation and handling of the claim is consistent with the obligation of good faith and fair dealing. This includes hundreds of evaluations of UM claims.

I have on many occasions been involved in and directed the investigation of and litigated practically every aspect of a UM claim, including: whether the claimant qualifies as an insured; whether the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle; the nature and extent of the insured's damages; whether those damages are caused by the fault of the owner or operator of an uninsured motor vehicle; and the extent of UM coverage, including whether the coverage can be stacked or is subject to an "other insurance" clause. I have also been retained as an expert witness in UM bad faith cases by both insureds' counsel and insurers' counsel.

Cases resulting in published trial or appellate court opinions in which I was either trial or appellate counsel include the following: Akin v. Ashland Chemical Co., 156 F.3d 1030 (10th Cir. 1998) cert den'd 526 U.S. 1112 (1994); Alea London Ltd. v. Canal Club, Inc., 231 P.3d 157 (Okla. Civ. App. 2009); Allstate Ins. Co. v. Fox, 139 F.3rd 911 (Tab.), 1998 WL 77745; American Interstate Ins. Co. v. Wilson Paving & Excavating, Inc., 2009 WL 3427992 (N.D. Okla. October 20, 2009) and 2010 WL 2624133 (N.D. Okla. June 25, 2010); Angelo v. Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Beeman v. Manville Corp. Asbestos Disease Compensation Fund, 496 N.W.2d 247 (Iowa 1993); Bristol v. Fibreboard Corp., 789 F.2d 846 (10th Cir. 1986); Case v. Fibreboard Corp., 743 P.2d 1062 (Okla. 1987); Cofer v. Morton, 784 P.2d 67 (Okla. 1989); Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), appeal

November 1, 2010
Page 3

*after remand*, 827 F.2d 667 (10th Cir. 1987); Condray v. Unum Life Ins. Co. of Am., 2009 WL 1312515 (W.D. Okla. May 7, 2009); First Financial Ins. Co. v. Roach, 80 F.3d 420 (10th Cir. 1996); Fisher v. Owens Corning Fiberglass Corp., 868 F.2d 1175 (10th Cir. 1989); Fleming v. Hall, 638 P.2d 1115 (Okla. 1981); Gonzalez v. Dub Ross Co., Inc., 224 P.3d 1283 (Okla. Civ. App. 2009); Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002); Horace Mann Ins. Co. v. Johnson, 953 F.2d 575 (10th Cir. 1991); Huff v. Fibreboard Corp., 836 F.2d 473 (10th Cir. 1987); Kerr-McGee Corporation v. Admiral Ins. Co., 905 P.2d 760 (Okla. 1995); Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979), *cert. den'd.*, 444 U.S. 856 (1979); Livengood v. Thetford, 681 F.Supp. 695 (W.D. Okla. 1988); Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co., 967 P.2d 479 (Okla.Civ.App. 1998); Sargent v. Central National Bank & Trust Co. of Enid, Oklahoma, 809 P.2d 1298 (Okla. 1991); Short v. Oklahoma Farmers Union, 619 P.2d 588 (Okla. 1980); Snethen v. Oklahoma State Union of the Farmers' Educational and Cooperative Union of America, 664 P.2d 377 (Okla. 1982); State Farm Mut. Ins. Co. v. Schwartz, 933 F.2d 848 (10th Cir. 1991) (amicus curiae); Takagi v. Wilson Foods Corp., 662 P.2d 308 (Okla. 1983); Tax Investments Concepts Inc. v. McLaughlin, 670 P.2d 981 (Okla. 1982); Thiry v. Armstrong World Industries, Inc., 661 P.2d 515 (Okla. 1983); Timberlake Const. Co. v. U.S. Fidelity & Guaranty Co., 71 F.3d 335 (10th Cir. 1995); Trinity Universal Ins. Co. v. Broussard, 932 F.Supp. 1307 (N.D. Okla. 1996); Vilseck v. Fibreboard Corp., 861 S.W.2d 659 (Mo. App. 1993); Wever v. State ex rel. Department of Human Services, 839 P.2d 672 (Okla. Civ. App. 1990); Wilson and Co. v. Reed, 603 P.2d 1172 (Okla. Civ. App. 1979); Wilson Foods Corp. v. Noble, 613 P.2d 485 (Okla. Civ. App. 1980); and Wilson Foods Corp. v. Porter, 612 P.2d 261 (Okla. 1980).

I participated in drafting the anti-stacking provisions of auto UM coverage subsequently upheld by the Oklahoma appellate courts in Withrow v. Pickard, 905 P.2d 800 (Okla. 1995), Breakfield v. Oklahoma Farmers Union Mut. Ins. Co., 910 P.2d 991 (Okla. 1995), and Kinder v. Oklahoma Farmers Union Mut. Ins. Co., 943 P.2d 617 (Okla. Civ. App. 1997). I have drafted many other types of clauses for use in various insurance policies, including insurance agents professional liability, umbrella/excess liability, commercial general liability, commercial property, auto, homeowners, farmowners, and dwelling policies. I have prepared drafts of entire business and personal auto policies.

I was a member of the State Bar of Texas from 1975 and continuing for several years until I discontinued my membership after moving to Oklahoma to practice. I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in all federal district courts in Oklahoma, the Tenth Circuit Court of Appeals, and the United States Supreme Court. I have also been admitted to practice *pro hac vice* in several trial and appellate courts outside of Oklahoma, including federal and state trial courts in Arkansas, Kansas, Missouri, Illinois, Arizona, Pennsylvania, California, New Jersey, New Mexico, Ohio and Texas. I have also been admitted *pro hac vice* before the Supreme Court of Iowa, and the Missouri, Illinois and Kansas intermediate appellate courts.

I am a member of the International Association of Defense Counsel, the American Bar

November 1, 2010
Page 4

Association, its Tort and Insurance Practice Section, and the Defense Research Institute. I was
for many years a member of the Oklahoma Association of Defense Counsel. I was selected as an
Oklahoma Super Lawyer in 2009 and 2010.

I have lectured and conducted seminars and prepared papers on various subjects for the
Oklahoma Bar Association, International Association of Defense Counsel, Oklahoma
Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma
School of Law, Oklahoma City University School of Law, The Conference on Consumer
Finance Law, and for insurance adjusters. Continuing education papers which I have prepared
and presented at seminars for lawyers, adjusters, and insurance agents include the following
which is not a complete list: Selected titles include: *Allocation of Fault-Identifying All Angles*,
OBA CLE (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*,
OBA CLE (Feb. 1990); *Documenting the Agreement*, OBA CLE (Dec. 1991 and Mar. 1995);
*Replacement Cost Property Insurance Coverage Without Replacement:* <u>Coblentz v. Oklahoma</u>
<u>Farm Bureau Mut. Ins. Co.;</u> The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People
Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA & Oklahoma
Insurance Department approved CE (Oct. 2009); and *Substantial Certainty Tort Claims By
Injured Employees Against Their Employers: What Workers Compensation Professionals Should
Know*, 11th Annual Spring Insurance Update Seminar (Oklahoma City & Dallas, April, 2010). I
was program planner and moderator for the OBA CLE Seminar, *What The Other UM Seminars
Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009). The latter two
seminars were also approved for continuing education credit for adjusters by the Oklahoma
Insurance Department. I am scheduled to present a seminar for the LeFlore County Bar
Association in December on auto liability and UM coverages.

I have presented client positions on insurance coverage issues to the Oklahoma Insurance
Department and advised the department informally on insurance coverage issues. I have
participated in drafting proposed legislation relating to insurance in Oklahoma and Idaho. This
includes bills in various sessions of the Oklahoma legislature to amend the Declaratory Judgment
Act, 12 O.S. §1651, to permit declaratory judgments concerning issues arising under liability
insurance policies. The Act finally was amended, effective November 1, 2004, to permit liability
insurance policy declaratory judgment actions, as the courts have subsequently held in <u>Knight v.
Miller</u>, 195 P.3d 372 (Okla. 2008) and <u>Equity Ins. Co. v. Garrett</u>, 178 P.3d 211 (Okla. Civ. App.
2008). Most recently I participated in the revision of the motor vehicle insurance laws in Title
47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular
session of the 2009 Legislature.

## III.  PRIOR TESTIMONY.

I have testified by deposition as an expert witness in the following cases:

<u>Allen v. Lynn Hickey Dodge</u>, No. CJ-96-6076, District Court of Oklahoma County,
Oklahoma, on February 7, 2003 for the plaintiffs and their attorney, Ed Abel; <u>Anders v. GEICO</u>,

November 1, 2010
Page 5

No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, on September 18 and September 19, 2003 for the defendant GEICO and its attorney, Jerry Pignato of Pignato & Cooper; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa County, Oklahoma, on June 3, 2004 for the defendant, Mid-Continent Casualty Co. and its attorney, Roger Butler of Secrest, Hill & Butler; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, on October 28, 2004 for the defendants and their attorney, Joe E. White, Jr. of White & Weddle; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma on November 16, 2005 for the defendant and its attorney, David Donchin of Durbin, Larimore & Bialick; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, on October 10, 2002 for the defendant GEICO and its attorneys, Baker and McKenzie; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburgh County, Oklahoma for the defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley of Steidley & Neal; Melton Truck Lines, Inc. v. Indemnity Ins. Co. of N. Am., No. CV-263-JHP-SHA, Northern District of Oklahoma, on August 2, 2007 for the defendant and its attorney, Robert Rivera, Jr. of Susman, Godfrey LLP; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, on September 8, 2005 for the defendant and its attorney, David Donchin of Durbin, Larimore & Bialick; Cordova v. Oklahoma Farm Bureau Ins. Co. and Colin McNatt, No. CJ-2008-1557, District Court of Oklahoma County on November 16, 2009 for plaintiff and her attorney Gregg W. Luther of West Law Firm; and Cearley v. Great American Ins. Co. of New York, No. CJ-2008-1202, District Court of Creek County on January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer of Steidley & Neal.

I have testified at trial as an expert witness in the following insurance bad faith cases in which I was deposed: Anders v. GEICO, Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.. I also testified at trial in Nelson v. Granite State Ins. Co., Case No. CIV-08-1165-M, United States District Court for the Western District of Oklahoma, on behalf of the defendant, and its attorney, Steve Holden of Holden, Carr & Skeens.

The cases in which I testified which were UM bad faith cases are: Anders, Horn, Cordova and Nelson.

## IV.  COMPENSATION.

I am charging your firm $250.00 per hour for my services as an expert witness on behalf of your client in this case.

## V.  DOCUMENTS REVIEWED.

I have reviewed the following documents: documents filed in the case referenced above; discovery responses of the plaintiff and defendant; copy of auto policy 915186247 12/28 issued

November 1, 2010
Page 6

by AIC to Gregory A. Tate (D-00006 – 000044); copies of portions of the AIC file for claim number 0131917205 (D-00045 – 00776); copies of portions of AIC P-CCSO Claim Policy Practices Procedures Manual (D-00777 – 00813); AIC Confidential Evaluation Documents (D-00814 – 00828); AIC Confidential UM/UIM The Early Recognition Process (D-00827 – 00837); selected documents produced by AIC from Wendelyn Perceful personnel file (D-00838 – 00843); depositions of Gregory A. Tate and Wendelyn Perceful taken in this case; pleadings and depositions of Gregory A. Tate and defendant Dolores Christian in No. CJ-2009-889, District Court of Cleveland County; January 8, 2010 Perceful-Luther letter (not produced as part of the file for claim number 0131917205); October 5, 2010 letter to you from Dr. Bobb; October 11, 2010 letter to you from Dr. Nees; summary of plaintiff's medical bills; copies of "McKinsey slides" posted by AIC on its website in 2008[1]; statues, case law and other authorities identified in this report. If I am furnished additional information or documents after the date of this report, I reserve the option to amend or supplement this report on the basis of such information and documents.

## VI. EXHIBITS.

In my trial testimony I may use as exhibits any of the following: portions of the auto policy identified in section V above which are discussed in this report; portions of the AIC claim file for claim number 0131917205 identified in section V and discussed in this report; AIC claims handling guidelines and "McKinsey slides" identified in section V above and discussed in this report; copies of Mr. Tate's healthcare provider bills and records included and not included in the AIC file for claim number 0131917205; and October 5 and October 11, 2010 letter reports from Drs. Bobb and Nees, respectively. As discovery in this case is not closed, I have not made a final determination on exhibits. However, if I identify any additional exhibits I may use in my testimony, I will promptly advise you.

## VII. DISCUSSION AND OPINIONS.

### A. Issues Addressed.

You asked me generally to evaluate whether AIC breached the covenant of good faith and fair dealing in its handling of the claim of Greg Tate under the UM coverage of the policy AIC issued to him. In common parlance, the general question you asked me to address is

---

[1] See history of AIC's resistance to discovery of McKinsey documents, including slides I reviewed, to AIC's public disclosure of many of these documents after losing most of the discovery battles, in Doan v. Allstate Ins. Co., 2008 WL 2223123 at *9 (E.D. Mich. May 23, 2008). The discovery dispute has resulted in a number of officially and unofficially published opinions, in addition to Doan. See e.g., McCallum v. Allstate Prop. & Cas. Ins. Co., 204 P.3d 944 (Wash. App. 2009) rev. den'd 217 P.3d 783 (Wash. 2009); Allstate Floridian Ins. Co. v. Office of Ins. Regulation, 981 So.2d 317 (Fla. App. 2008) rev. den'd 987 So.2d 79 (Fla. 2008); and Pincheira v. Allstate Ins. Co., 190 P.3d 322 (N.M. 2008).

November 1, 2010
Page 7

whether AIC acted in "bad faith"?[2]  More specifically, you have asked me to address certain required elements of a bad faith claim, including whether the conduct of AIC in investigating, evaluating (or not evaluating) and not offering payment on Mr. Tate's UM claim was "reasonable under the circumstances", and whether AIC "failed to deal fairly and act in good faith toward [Mr. Tate] in handling of the UM claim".[3]  These issues necessarily must be addressed because insurers have both a "contractual duty to *timely* and *properly* pay a claim", and "a duty to *timely* and *properly* investigate an insurance claim".[4]  In the specific context of this case, it is also important to note that a constructive denial of a UM claim results when the UM insurer takes the position that the value of the claim does not exceed the available auto liability insurance[5], and that the duty of good faith and fair dealing does not end when the insured sues, and the insurer has yet to complete its investigation, evaluation or to make an offer on the insured's claim.[6]  Moreover, a key component of "good faith and fair dealing" is

---

[2] "Bad faith" is the shorthand used to describe a violation of the covenant of good faith and fair dealing which is implied in every insurance contract by operation of Oklahoma law.  See Brown v. Patel, 157 P.3d 117, 121 n.5 (Okla. 2007).

[3] *Id.* at 129.

[4] *Id.* at 122.

[5] *Id.*, 157 P.3d at 129; Morgan v. Valley Ins. Co., 2009 WL 1683644 (W.D. Okla. June 12, 2009).

[6] *See e.g.*, Brown v. Patel, 157 P.3d at 128 ("an insurer may engage in certain litigation conduct pursuant to a procedural right and yet by that act violate its duty to its insured"); Fullbright v. State Farm Mut. Auto. Ins. Co., 2010 WL 274217 at *3 (W.D. Okla. Jan. 15, 2010) (denying motion to quash deposition of adjuster who was responsible for UM claim after insured in suit sued insurer for bad faith delay in payment of claim, the court stating "Plaintiffs may conduct discovery regarding the processing and investigation of their claim by the adjuster or adjusters who replaced Ms. Foster", who was the adjuster assigned to the UM claim initially and until 10 days after suit was filed); Haddick v. Valor Ins., 735 N.E.2d 132, 133 (Ill. App. 2000) ("an insurance company has a duty to act in good faith in settling a claim against its policyholder in a timely manner both before and after suit is filed"); Ingalls v. Paul Revere Life Ins. Grp., 561 N.W.2d 273, 284 N.D. 1997 (insured may recover for emotional distress in bad faith claim based upon conduct of the insurer during bad faith case); White v. Western Title Ins. Co., 710 P.2d 309, 316-17 (Cal. 1985) (duty of good faith continues during litigation because the contractual relationship between insurer and insured continues); Knotts v. Zurich Ins. Co., 197 S.W.3d 512, 522-23 (Ky. 2006) (evidence of post-suit "settlement behavior but not of litigation conduct" admissible in bad faith case), applied in Budde v. State Farm Mut. Auto. Ins. Co., 2009 WL 3483951 (W.D. Ky. Oct. 22, 2009); Morgan v. Valley Ins. Co., 2009 WL 3755076 at *3 (W.D. Okla. Nov. 5, 2009) (holding that "[a]ctivities of Defendant in the nature of the continuation of claim evaluation, processing, and payment or non-payment – post-litigation – will be generally deemed admissible"); O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. 1999); Palmer v. Farmers Ins. Exch., 861 P.2d 895, 913 (Mont. 1993) ("an insurer's duty to deal fairly and not to withhold payment of valid claims does not end when the insured files a complaint against the insurer"); Spadafore v. Blue Shield, 486 N.E.2d 1201, 1204 (Ohio App. 1985) ("evidence of the breach of the insurer's duty to exercise good faith occurring after the time of filing suit is relevant so long as the evidence related to the bad faith or handling or refusal to pay the claim"); State Farm Mut. Auto. Ins. Co. v. Dowdy, 2006 WL 2265505 at *4 (N.D. Okla. Aug. 7, 2006) ("although '[a]n action for declaratory relief is appropriate to resolve coverage disputes between the insurer and insured,'…, whether State Farm's action in filing for declaratory relief under the circumstances of this case raises a genuine issue of material fact as to whether State Farm acted in good

November 1, 2010
Page 8

recognizing "[a]n insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed.[7]

　　To make this evaluation it is necessary for me to consider not only what AIC did and did not do in the handling of the UM claim, but the legal, insurance industry, and internal AIC standards applicable to the handling of insurance claims, and my personal experience in conducting and supervising the investigation, evaluation and litigation of UM claims.   These are all proper references in evaluating the conduct of AIC.[8]

---

faith and dealt fairly with its insureds"); and Tucson Airport Auth. v. Certain Underw. at Lloyd's, London, 918 P.2d 1063, 1066 (Ariz. App. 1996) (complaint stated a claim upon which relief may be granted for bad faith based upon conduct and communication of the insurers during a declaratory judgment action to determine coverage for lawsuits against the insured).

[7] Newport v. USAA, 11 P.3d 190, 196 (Okla. 2000); Badillo v. Mid-Century Ins. Co., 121 P.3d 1060, 1093 (Okla. 2005).

[8] Brown v. Patel, 157 P.3d at 122 ("bad-faith actions have been based upon an insurer's failure to follow judicial construction of insurance contracts or available applicable law, as well as upon duties that are necessary for an insurer's timely determination of a claim"); Barnes v. Oklahoma Farm Bur. Mut. Ins. Co., 11 P.3d 162, 171 (Okla. 2000) (insurer did not follow "the law readily available to insurer and its counsel" in the application of the subrogation provisions of the UM statute, 36 O.S. §3636); Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 799-800 (10th Cir. 1995) (because insurers are "obviously well aware" of the principle that ambiguity in policy language is construed most favorably to the insured, "mere ambiguity" in policy language "cannot, as a matter of law, create a defense to a bad faith claim"); Willis v. Midland Risk Ins. Co., 42 F.3d 607, 612 (10th Cir. 1994) ("the insurer is held to knowledge of the applicable Oklahoma law, and the reasonableness of its decision must be judged in light of that law"); Vining v. Enterprise Fin. Grp., Inc., 148 F.3d 1206, 1217-18 (10th Cir. 1998) (the Oklahoma Insurance Department's market examination report of the defendant insurer and the insurer's training manual were relevant and admissible to show the insurer "engaged in a pervasive, consistent pattern of abusive rescissions" of health insurance policies); Ford v. Allied Mut. Ins. Co., 72 F.3d 836 (10th Cir. 1996) (expert testimony on insurance industry standards admissible in bad faith case for failure to pay UM claim); Seikel v. American Med. Security Life Ins. Co., 2007 WL 4864462 at *1 (W.D. Okla. May 11, 2007) ("Where the court determines that such [expert] testimony will assist the trier of fact in understanding practices and procedures in the insurance industry or related matters presented by the circumstances of a particular case, expert testimony is proper" because "the average juror is not likely to be familiar with the practices and procedures involved in processing insurance claims"); Johnson v. Government Emp'ees Ins. Co., 2008 WL 4186216 at *2 (W.D. Okla. Sept. 8, 2008) (lawyer with 30 years plus experience in insurance litigation qualified to testify in UM bad faith case "drawing from both his understanding of the law and his experience with respect to how claims should be handled by an insurance company") and 2008 WL 5545261 at *2 (Sept. 5, 2008) (expert "may testify regarding the insurance industry's custom and practice in completing an injury evaluation, appropriate reasons for foregoing a written evaluation, and that under the facts presented in this case" the expert "himself, would forego a written evaluation"); Payne v. GEICO Indem. Co., 2002 WL 34439222 at *2 (W.D. Okla. May 17, 2002) (experts "will be permitted to testify as to the custom and practice of the industry in investigating and handling claims" and "as to considerations in evaluating an insured's claim, based on industry custom and practice and/or their own experience").

November 1, 2010
Page 9

## B. Identification of Standards.

### 1. Legal Standards.

The first source of standards by which the conduct of AIC may be measured is the UM statute itself, 36 O.S. §3636, and the case law applying it. Evaluation in light of the statute and case law construing it is necessary because the statute describes the elements of a UM claim such that any policy provision imposing additional requirements for recovery or narrowing the scope of the statutorily mandated coverage are unenforceable.[9]  The Oklahoma courts have identified the essential elements of a UM claim on the basis of the language of the UM statute. These are: (1) the claimant qualifies as an insured as defined in the policy[10]; (2) the insured sustained bodily injury caused by an accident, viewed from the perspective of the insured[11]; (3) the bodily injury arose out of the ownership, maintenance or use of a motor vehicle, meaning there was a causal relationship between the bodily injury and the ownership, maintenance or use of a motor vehicle for transportation purposes[12]; (4) such motor vehicle must be an "uninsured motor vehicle", as defined in §3636(C)[13]; (5) the insured must be legally entitled to recover damages from the owner or operator of the uninsured motor vehicle, meaning the owner or operator was sufficiently at fault under the applicable law of torts to be held liable for causing the insured's injuries[14].  The Tate Policy includes the essential elements of a UM claim in Part 3, as amended by the Oklahoma Amendatory Endorsement.  As will be discussed, the only elements in Mr. Tate's claim disputed by AIC are the extent to which Mr. Tate sustained injury caused by a motor vehicle accident (element 1), and whether the nature and extent of his damages render the tortfeasor's vehicle an "uninsured motor vehicle" (element 4).

If these elements exist, the insurer has a duty to evaluate and pay the UM claim.[15]  As relevant to Mr. Tate's claim, a UM insurer by law cannot avoid its payment obligation merely because the tortfeasor's liability insurer has not tendered the limit of insurance under the tortfeasor's policy to the UM insured.[16]  If the UM insured's damages exceed the amount of the tortfeasor's liability insurance (commonly referred to as an "underinsured" motorist claim), the UM insured has an affirmative duty to pay up to the limit of the UM coverage.[17]  Upon such payment the UM insurer may seek, via the equitable doctrine of subrogation, to recover its

[9] *See e.g.,* State Farm Mut. Auto. Ins. Co. v. Wendt, 708 P.2d 581 (Okla. 1985); State Farm Mut. Auto. Ins. Co. v. Greer, 777 P.2d 941 (Okla. 1989).
[10] Graham v. Travelers Ins. Co., 61 P.3d 225, 229-30 (Okla. 2002).
[11] Willard v. Kelley, 803 P.2d 1124, 1130 (Okla. 1990).
[12] Safeco Ins. Co. of Am. v. Sanders, 803 P.2d 688-691 (Okla. 1990); Willard v. Kelley, 803 P.2d at 1130-31.
[13] Gates v. Eller, 22 P.3d 1215, 1218-19 (Okla. 2001)
[14] Uptegraft v. Home Ins. Co., 663 P.2d 681, 685 (Okla. 1983); Martin v. Hartford Underw. Ins. Co., 918 P.2d 49, 51 (Okla. 1990).
[15] Burch v. Allstate Ins. Co., 977 P.2d 1052, 1064 (Okla. 1998).
[16] Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1111-12 (Okla. 1991).
[17] Burch v. Allstate, 977 P.2d at 1064. *See also,* Government Employees Ins. Co. v. Quine, 2009 WL 2497305 at *2 (W.D. Okla. Aug. 17, 2009).

November 1, 2010
Page 10

payment from the tortfeasor and his or her liability insurer.[18]   However, the UM insurer's recovery, like that of any other subrogated insurer, will be subject to the "make whole" rule of Oklahoma law where, as in the Tate Policy, there is no language overriding this rule.[19]

Another statutory source of standards is the Oklahoma Unfair Claims Practices Act, 36 O.S. §§1250.1-1250.17 (OUCPA).  The Act includes sections adopted as a model act by the National Association of Insurance Commissioners.[20]   The model act or versions of it have been adopted in most states, and contain standards based upon a consensus understanding of good claims handling procedures.[21]   The standards in the Act (and implementing regulations in some states) provide guidance for claims handling based upon extensive experience of insurance regulators in the several states: "The National Association of Insurance Commissioners (NAIC) create the Unfair Claims Settlement Practices Act 'to set forth standards for the investigation and disposition of claims arising under policies or certificates.'"[22]   Accordingly, the standards in the Act may be considered in evaluating an insurer's conduct in a bad faith case[23] even though, as in Oklahoma, a violation of the Act does not give rise to a private cause of action.[24]

AIC also recognizes the applicability of the standards in the Act.  Section 1 of the P-CCSO Claims Policy Practices Procedure Manual states in pertinent part:

> THE INSURING PUBLIC HAS THE RIGHT TO RELY ON ALLSTATE MEN AND WOMEN TO BE HONEST IN EVERY ACTIVITY OF THE COMPANY.  TO FULFILL THAT RESPONSIBILTY, ALLSTATE CLAIM EMPLOYEES ARE EXPECTED TO CONDUCT ALL THEIR DEALINGS WITH THE HIGHEST DEGREE OF INTEGRITY.   IF ALL CLAIM

---

[18] 36 O.S. §3636(E); Tate Policy, GENERAL PROVISIONS, **Subrogation Rights** (D-00029); Burch, 977 P.2d at 1059.

[19] Manokoune v. State Farm Mut. Auto. Ins. Co., 145 P.3d 1081, 1086 (Okla. 2006).

[20] *See*, FC&S BULLETINS, Personal Lines Vol. at Vcp-1 (Nat'l Underw. Co. 2003).

[21] *See e.g.*, Moradi-Shalal v. Fireman's Fund Ins. Co., 758 P.2d 58, 63 (Cal. 1988); Earth Scientists (Petro Services) Ltd. v. United States Fid. & Guar. Co., 619 F.Supp. 1465, 1470 (D. Kan. 1985); and Houser, *The Unfair Claims Settlement Practices Act*, 15 THE FORUM 336 (1979).

[22] FC&S BULLETINS, *supra*. n.17 at Vcp-1.

[23] Beers v. Hilory, 2010 OK CIV APP 99 ¶30 recently held the Oklahoma Unfair Claims Practices Act "can provide the district court with guidance in determining whether particular conduct on the part of an insurer is unreasonable and sufficient to constitute a basis for a bad faith action".  Similar views are expressed in the following cases: Heyden v. Safeco Title Ins. Co., 498 N.W.2d 905, 909-11 (Wis. App. 1993) *rev. den'd* 508 N.W.2d 421 (Wis. 1993), *overruled on other gds. by* Weiss v. United Fire & Cas. Co., 541 N.W.2d 753 (Wis. 1995); Walston v. Monumental Life Ins. Co., 923 P.2d 456, 460-61 (Idaho 1996); Inland Grp. of Cos. v. Providence Wash. Ins. Co., 985 P.2d 674, 683 (Idaho 1999); Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228, 1232-33 (Pa. Super. 1994); MacFarland v. United States Fid. & Guar. Co., 818 F.Supp. 108, 110-11 (E.D. Pa. 1993); and Miglicio v. HCM Claim Mgmt. Corp., 672 A.2d 266, 271 (N.J. Super. L.Div. 1995).

[24] So held in Walker v. Chouteau, 849 P.2d 1085, 1087 (Okla. 1993); and Gianfillippo v. Northland Cas. Co., 861 P.2d 308, 310 (Okla. 1993).

November 1, 2010
Page 11

> EMPLOYEES MAINTAIN HIGH STANDARDS OF INTEGRITY, THE INSURING PUBLIC WILL RESPOND WITH THE CONFIDENCE AND RESPECT THAT ARE ESSENTIAL TO ALLSTATE'S FUTURE GROWTH.
>
> THESE BASIC PRINCIPLES OF INDIVIDUAL CONDUCT **ALSO REQUIRE THAT ALLSTATE CLAIM PERSONNEL COMPLY WITH ALL PERTINENT LAWS AND REGULATIONS GOVERNING THE STATE OR JURISDICTION INVOLVED** (D-00790 – emp. add.).

The Act is a "pertinent" law for the conduct of claims adjusting.

## 2. Industry Standards.

The standards identified in the law are part of the standards the insurance industry recognizes are applicable in the adjustment of claims but there are others. Additional industry standards apply in this case. All well-run claim departments stress the need to document in the claims file all significant activity regarding a claim, for it is an axiom of claims handling that "if it's not in the claim file, it didn't happen". Of course, the axiom is not literally true in all cases but it recognizes the reality of claims handling. Documentation serves several purposes. It tends to corroborate what is said and done, both by the adjuster and his supervisor, and by others with whom they deal. Documentation is also necessary to explain the decision making process on a claim. This is important for a number of reasons. It allows the supervisor to evaluate an adjuster's job performance. It gives government regulators information to evaluate when conducting routine examinations of claim files, as, for example, to determine if the insurer is setting reserves for damages as required by law.[25] Documentation also provides the adjuster, the supervisor and the claimant with a explanation for why the decisions made regarding a claim were made, and the steps taken (or not taken) to investigate a claim. Documentation provides the rationale for what is done on a claim, providing the adjuster with a road map with which to compose any communications which explain the company's position with regard to a claim. Of course, a well documented claim file allows for a much easier evaluation of the good or bad faith of the insurer, should litigation result. And documentation also will reflect whether the insurance company is complying with applicable law, policy requirements, and the company's own internal standards in processing a claim.[26]

The standard practice in the insurance industry is to utilize investigative tools which are routinely included in insurance policies, such as the right to insist upon the insured's

---

[25] *See e.g.*, 36 O.S. §607(A) (prohibiting a foreign insurer from being authorized to transact insurance in Oklahoma if it does not maintain reserves).

[26] Among other uses, evidence an insurer knowingly uses an incorrect and unreasonable interpretation of policy language or law can be bad faith. *E.g.*, Barnes v. Oklahoma Farm Bur. Mut. Ins. Co., 11 P.3d 162, 171 (Okla. 2000); Metzger v. American Fid. Assur. Co., 2006 WL 2792435 at *3 (W.D. Okla. Sept. 26, 2006).

November 1, 2010
Page 12

cooperation in processing a claim, the right to conduct an examination under oath of an insured, the right to require an insured to sign authorizations to obtain relevant records and reports,[27] and the right to require the insured to undergo physical examination by a physician of the insurance company's choice.[28]  All of these rights are conferred upon AIC in the Tate Policy in the following language:

> **What To Do If There Is A Loss**
> ***
> 2.  We may require any person making a claim to file with **us** a sworn proof of loss.  **We** may also require that person to submit to examinations under oath, separately and apart from others, and to sign the transcript.
> ***
>
> **Medical Reports**
> The injured person may be required to take medical examinations by physicians **we** choose, as often as **we** reasonably require.  **We** must be given authorization to obtain medical reports and other records pertinent to the claim.
>
> **Assistance And Cooperation Of The Insured**
> An insured person must cooperate with **us** in the investigation, settlement and defense of any claim or lawsuit....
>
> [D-00028-29]

Another industry standard relates to the use of the investigatory tools given to AIC by the policy and quoted above.  When an issue arises concerning whether an injury was caused by a motor vehicle accident, thereby presenting an issue concerning whether the treatment for that injury was necessary because of the accident, and whether the consequences of the injury likewise flow from the accident, professional claims personnel recognize they are not qualified to render opinions on medical causation.  Therefore, they routinely seek out the opinions of

---

[27] *See e.g.,* Burgess v. Mid-Century Ins. Co., 841 P.2d 325, 329 (Colo. App. 1992) (both industry and insurer's standard practice was to obtain reports from treating healthcare providers in order to make a determination about the reasonableness and necessity of medical treatment); Hale v. Farmers Ins. Exch., 117 Cal.Rptr. 146, 153 (App. 1974) (jury could award punitive damages where insurer had a "practice of making unauthorized and oppressive demands on the insured to himself furnish medical reports when the policy required only that the insured execute the necessary consents so that the company could procure whatever medical reports it desired").

[28] *See e.g.,* Krajicek v. Automobile Club Inter-Ins. Exch., Inc., 2009 WL 3254904 at *8 (N.D. Okla. Oct. 7, 2009) ("Notably, AAA did not hire an independent medical examiner to examine Joyce [UM insured], and Brocato's [adjuster] conclusions are therefore not supported by any medical opinion in the claim file at the time of her decision to deny coverage").

November 1, 2010
Page 13

healthcare providers who treated an injured insured, as well as consultants they hire for the specific purpose of evaluating the causation issue, as other medical issues which may arise.

This standard exists in recognition of two facts. One, most adjusters are simply not qualified to render medical causation opinions even though, if properly trained and with experience, they can recognize circumstances in which medical causation is an issue.[29] Secondly, professional claims people know that expert medical testimony is usually required in court on the question of medical causation and disability because in most cases a jury (like the adjuster) is not capable of deciding those issues based upon common knowledge and experience.[30]

Closely related to this standard is another which recognizes that, absent expert medical opinion to support a different causation or disability explanation than that presented by a treating healthcare provider, the issue of medical causation or disability is generally not in dispute. That is, professional claims personnel recognize that, if the records of the treatment of an injured insured show a causal connection between the complaints, treatment, and consequences, and the motor vehicle accident in question, medical causation usually should be considered as not in dispute, unless the insurance company obtains conflicting medical opinion, either from treating doctors or consultants. This standard is but a recognition that, absent conflicting expert medical opinion, if the only evidence of medical causation links the injury, treatment and consequences to the accident in question, this evidence should not be disregarded.[31] Moreover, this standard recognizes the duty of good faith and fair dealing requires equal consideration of the insured's

---

[29] *See,* Krajicek, 2009 WL 3254904 at *8-9 (holding a legitimate dispute of the causation of injury for which UM benefits sought did not exist because adjuster, without aid of expert medical opinion, did not believe injury caused by accident); Wilson v. 21st Century Ins. Co., 171 P.3d 1082, 1087 (Cal. 2007) ("21st Century directs us to no medical report or opinion on the basis of which the claims examiner could reasonably have ignored or disbelieved Dr. Southern's conclusion that the changes in Wilson's cervical spine were probably caused by her recent trauma; as far as the record reveals, the claims examiner had no basis for his contrary conclusion that such a causative link was 'unlikely'. Nor is there any apparent medical basis for the claims examiner's assertion that Wilson has 'preexisting degenerative disc disease'. No such diagnosis appears in the medical reports submitted to 21st Century, and **we are directed to no evidence that the company's claims examiner had sufficient medical expertise to make such a diagnosis himself**") (emp. add.).

[30] *See e.g.,* Christian v. Gray, 65 P.3d 591, 601-02 (Okla. 2003).

[31] *See e.g.,* Burkett v. Moran, 410 P.2d 876, 878-79 (Okla. 1965) (where jury awarded damages for medical expenses and lost wages as a result of a whiplash injury but nothing for pain and suffering despite uncontradicted evidence of it, the Supreme Court reversed, stating that "[u]nder the uncontradicted evidence, if defendant was liable to plaintiff at all, plaintiff was entitled to recover damages for pain and suffering"); and Clay v. Choctaw Nation Care Center, LLC, 210 P.3d 855, 859-60 (Okla. Civ. App. 2008) (where jury found nursing home negligent but awarded zero damages for injuries to and death of resident, "the jury's zero damage verdict was not supported by reasonable competent evidence" and "was inconsistent with the compelling and uncontradicted evidence of Plaintiff's damage").

November 1, 2010
Page 14

interest in being timely and fairly compensated, with the insurer's interest in not paying claims it does not owe, or overpaying claims it does owe.[32]

Evaluations of bodily injury claims, regardless of the coverage under which the claim is made, are generally conducted to arrive at a range of value, not a specific number.  This is because experience teaches that the likelihood of accurately predicting the specific amount which a jury in a particular forum will award as damages is next to nil.

### 3.  AIC Internal Standards.

AIC has internal claims handling standards.  The P-CCSO Claim Policy Practices Procedures Manual contains chapter 2, section 3, entitled *Guiding Principles Relating to Auto Personal Claims* (D-00793) contains the following pertinent statements:

- "• Conduct claim investigation in a diligent search for the facts as promptly as possible"
- "• Conclude each claim, large or small, on the basis of its own merits, in the light of the facts, the law and the coverages afforded"
- "• Assist in the physical rehabilitation of injured person where such procedure is indicated by the injury, the liability and the policy provisions"
- "• Facilitate, in the case of claims involving more than one company, the prompt and fair disposition of the claim, later seeking to resolve any controversy between insurance companies without recourse to the courts."

Chapter 4 section 3, entitled *Coverage Reserving*, contains the following pertinent provisions:

**2.2 Coverage SS**

***

Case Reserving on SS [UM] Claims will depend on the following factors:
1. Injury, **and**
2. Capacity to claim, **and**
3. Questionable, probable, or clear liability on the part of the uninsured motorist....
4. Claimant has "uncompensated" specials not offset by PIP or other offsetting coverage, **and/or**

---

[32] Thus, conducting a biased investigation may be the basis for a bad faith claim, McCoy v. Oklahoma Farm Bur. Mut. Ins. Co., 841 P.2d 568, 571 (Okla. 1992), just as failing to seek out available information supporting an insured's claim is likewise potential evidence of bad faith.  McCorkle v. Great Atlantic Ins. Co., 637 P.2d 583, 584 (Okla. 1981).

November 1, 2010
Page 15

    5. Claimant may or has overcome a threshold and can claim general damages.

### 2.3 Underinsured Motorist – Bodily Injury

Regular Case Reserves are open on SU claims when the following criteria are met:
1. Injury, **and**
2. Capacity to claim, **and**
3. Questionable, probable, or clear liability on the part of the <u>under</u>insured motorist, **and** applicable triggers have been met.

In properly reserving a Coverage SU exposure, it is **very important** to know under what circumstances a UIM bodily injury exposure is "triggered." This will depend on the policy/endorsement language of a particular state and any case law that bears on the subject. Therefore, it is important that a claim employee have a clear understanding of the extent of UIM protection afforded under the applicable policy and the particular state involved. [D-00799 – 800]

Chapter 6, section 1, entitled *Verification of Special Damages Bodily Injury*, states in pertinent part:

### 1.0 General

It is the responsibility of the Adjuster to verify that the claimant sustained an injury, was actually disabled (if alleged) and the resulting special damages (medical, wage loss, etc.) were appropriate.

It is recognized that complete verification is not possible in all cases....
***

### 2.0 Total Special Damages – More Than $1500

If total special damages (other than ambulance and emergency room charges incurred within 24 hours after the accident) exceed $1500 complete **written verification**, i.e., copies of bills, wage statements, medical reports, etc., is required.
***

### 3.0 Special Damages Projection

Future medical expenses and income loss may be projected in addition to the incurred and verified special damages. Such projections are to be based on the medical investigation, the general nature of the injury, its normal disability

November 1, 2010
Page 16

period, and treatment course, and the realistic cost of such treatment. [D-00810].

Chapter 7, section 1, entitled *Customer Service Policy* states in pertinent part: Our Claim Department is committed to providing help when it's needed, to ensure "Peace of Mind" for customers who have had an accident or other loss.

We are committed to providing claim service that is customer focused and goes beyond the ordinary – claim service that exceeds the expectations of our customers and causes them to recommend Allstate to others.

The customer relationship characteristics of Allstate claim service are:

"Leave it to us" – We minimize forms and keep procedures simple.

Responsiveness – We are available 24 hours a day every day. We provide immediate emergency service (Help Is On The Way) and we promptly respond to our customer's needs, phone calls and letters.

Empathy – We understand how upsetting an accident or other loss can be, and recognize there is more to handling claims than processing information and writing checks.

Reliability – We can be counted on to provide help when it's needed. We have the facilities, resources and people required to deal with any loss situation.

Assurance – We genuinely care about the needs and the feelings of our customers. We take the time to explain the claim process to our customers and we keep our customers advised of the status of their claim.

Customer Focused – We do things right the first time, and in the manner that best serves the needs of our customers. [D-00813].

**C. The Handling of Greg Tate's Claim.**

**1. Initial Chronology.**

On February 25, 2009, Mr. Tate, a "you" in the Tate Policy issued by AIC and thus an insured in the UM coverage of the policy[33], was driving his 1991 Chevrolet pickup

---

[33] See Tate Policy, **Definitions Used Throughout Policy** ¶11 [D-00027]; **Additional Definitions for Part 3** ¶2.a [D-00037].

November 1, 2010
Page 17

northbound in the outside lane in the 1200 block of East Robinson Avenue in Norman when a Lincoln Continental driven by 78 year old Dolores Christian eastbound on Robinson turned left (north) in front of Tate's pickup, even though Christian saw the pickup before she turned. Christian was intending to turn into the Dollar General Store parking lot on the north side of Robinson. Tate braked to avoid contact with the Lincoln but was unable to stop before a collision occurred. The force of the collision pushed the Lincoln into a Toyota Camry which was stopped at the exit for Dollar General Store, intending to enter northbound traffic on Robinson.[34]

Tate testified he was "hit very hard, slamming into the steering wheel, going back and hitting the back of my truck [windshield] with my head, sliding sideways and being hit again which threw me down into the floorboard onto the four-wheel drive stick shift on my leg. And then I remember being tossed around some more and hitting something else".[35] Tate testified his arms, shoulders, and chest hit the steering wheel. He described the collision as "[t]he hardest hit I ever had in my life" and "it was the most painful thing I have ever experienced". He "was sore everywhere".[36] His "right leg swelled up quite a bit from hitting the stick shift".[37] This testimony is consistent with the statement AIC took from Tate prior to the filing of suit.[38]

The accident occurred close to the office of the AIC agent through whom the Tate Policy was written. While still in his pickup after the collision Tate attempted to call his son on his cell phone but accidentally dialed the number of the agent. The agent became immediately aware of the collision because he actually came over to Tate's pickup but, according to Tate, "he turned around and started walking off" without talking to Tate.[39] Subsequently, when Tate was in the agent's office a few days after the accident, the agent would not even talk to him or, for that matter, accept his mother's check for a premium payment on his policy because it was "too early" for it to be paid.[40]

According to the police report AIC insured both the Dolores Christian and the Tate vehicles [D-00476]. As was later determined the per person policy limit of the Christian liability coverage was $100,000.[41] As best I can tell AIC opened a claim, 0131917205, under Tate's Policy on March 3, 2009.[42] The adjuster initially assigned to the claim appears to have been investigating the potential for Dolores Christian to make a claim against Tate, or for the driver stopped at the Dollar General exit to make such a claim, in addition to a potential claim by Mr.

---

[34] Official Oklahoma Traffic Collision Report [D-00476]; Greg Tate depo. 29; Claim History Report (CHR) 3/4/09 entry summarizing Dolores Christian statement [D-00076].
[35] Id. Tate depo. 30-31.
[36] Id. 33-35.
[37] Id. 35.
[38] See D-00762.
[39] Id. 54-55.
[40] Id. 55-56.
[41] See CHR 7/30/09 entry [D-00063].
[42] Id. 3/3/09 entries [D-00087984].

November 1, 2010
Page 18

Tate under the $2,000 medical payments coverage in his policy. However, this adjuster, Terry Murphy-Rhude, also spoke to an assistant in your office on March 3, indicating she knew Mr. Tate was represented.[43] The adjuster also appears to have been provided information that the driver of the vehicle stopped at the Dollar General exit said Mr. Tate was not at fault.[44] Another entry says Murphy-Rhude reviewed a statement of Dolores Christian taken by the AIC adjuster handling the claim under the liability coverage of the Christian policy, after that adjuster obtained Christian's permission[45]. The liability claims adjusters were in the same Oklahoma City building as the UM adjusters[46]. The Christian statement indicates Christian had seen Tate's pickup five car lengths before she made a turn but thought she had plenty of time to turn.[47] Murphy-Rhude spoke to you the next day, March 4, at which time you informed the adjuster that Mr. Tate was making a UM claim, he had been knocked unconscious as a result of the collision, the impact with his body broke the steering wheel, and he had been transported by ambulance to the hospital.[48]

## 2. Significance of McKinsey Slides.

The fact you were determined to be representing Mr. Tate on a UM claim is a critical factor in how AIC handles UM claims (although not mentioned in the P-CCSO Claim Policy Practices Procedures Manual). The McKinsey slides reflect AIC's view that "[a]ttorney representation is perceived by claimants as a way to achieve better settlements" and "[o]ur analysis suggests that, over time, attorney involvement leads to higher overall settlements and overpayments, especially as markets become litigious…. Breaking this cycle will require aggressive strategies, constructive execution, and strong leadership."[49]   The goal then is "[r]educing the need for attorney involvement" and, if this fails (as with Mr. Tate), "[o]nce attorney representation has occurred, more aggressive and consistent negotiation and litigation strategies may be required…."[50]  More succinctly, "[t]he key objective is to keep attorneys out".[51]  With regard to the "damage verification and evaluation process", the goal is to change the current AIC process which "allows claimants and attorneys to dictate treatment."[52]

One of the ways the McKinsey slides identify as being more aggressive when claimants hire lawyers to represent them rather than depend upon the good graces of AIC to do the right thing on their claim, is "an increased focus on using litigation as a tool to consistently

---

[43] Id. 3/3/09 entry [D-00080].
[44] Id. [D-00079].
[45] Id. 3/3/09 entry [D-00081].
[46] Perceful depo. 102-103.
[47] CHR 3/3/09 entry [D-00081].
[48] Id. 3/4/09 entry [D-00079].
[49] C000002339 & 2445.
[50] Id.
[51] C000002445 & 2449.
[52] C000003369.

  
November 1, 2010
Page 19

maintain fair market values".[53]   Translated, this means making claimants, including insureds with UM claims, sue to collect on their claims because, in litigation, AIC believes it will do better over time and thus litigation helps to "consistently reduce the value of claims".  The reason forcing claimants into litigation is considered positive to drive down claim payments is that AIC "can draw on significant resources to support litigation" while the claimant's attorney "[c]an face significant cash flow and staff constraints."[54]   This is well illustrated by the current case in which you have incurred significant expense for depositions, reports from Drs. Bobb and Nees, and Lon Huff and you will continue to incur expenses for additional depositions and, potentially, expert medical witnesses, as well as for me, as this case proceeds, plus whatever expenses you incur in the case against Christian.

The way AIC establishes "fair market values" through litigation is outlined in the McKinsey slides.  One is to "[p]lay to win in court" and then to tell other claimants that if you get a lawyer and sue, this is what you are looking on average at recovering (but only after AIC "plays to win" in court and the claimant's attorney is faced with "significant cash flow and staff constraints").[55]   Consistent with this approach the slides identify considerations to "[r]educe propensity to involve attorneys" and how to keep recovery down by forcing litigation, as by "[a]lign 'alligator' with attorneys".[56]   In sum, AIC proclaims – "**We will win the economics game**" and "**Winning will be a zero sum game**".[57]

The slides lay out the dichotomy in strategy between unrepresented and represented claimants in terms of the time to resolve claims.  For unrepresented claimants, a first settlement offer is to be made within 65 days of the accident whereas it is to be made to an attorney representing a claimant within 350 days.  While the offer to an unrepresented claimant is to be made after AIC's "Damage verification evaluation" (made in 60 days), in attorney represented claims, the offer is to be made before damages are verified and an evaluation is made (which is to occur within 396 days).  In unrepresented claims AIC expects to settle at 70 days from the date of accident but in represented claims at 537 days.[58]   These drastic time differences are consistent with the aggressive strategy for handling represented bodily injury liability and UM claims in which it is recommended to use the "'Alligator' approach… with plaintiff attorneys", and then "[s]it and wait" them out.[59]

There is an obvious overall goal of the strategies identified in the McKinsey slides which are revealed as "the opportunity is large enough in shareholder value terms to be worth pursuing and will require significant changes in processing and organizational elements,

---

[53] C0000357 & 369.
[54] C000002359.
[55] C00000369 & 371.
[56] C00000371.
[57] C000003091 (emp. add.).
[58] C000003045.
[59] C000003354.

November 1, 2010
Page 20

especially when plaintiff attorneys are involved."[60]    AIC is part of the Allstate Corporation conglomerate, a publicly traded company.  Consequently, "shareholder value" is a major concern of management.  One analysis of "Potential Shareholder Value Impact" in the McKinsey slides of the aggressive strategy to employ against represented claimants includes "weighted average loss payout by injury for BI/UM/UIM claims is 50% higher for attorney represented claims compared to non-represented claims".[61]  Given the 50% weighted difference in payments by AIC for unrepresented and represented claims, it is easy to understand why the shareholders of the AIC holding company would benefit from driving lawyers out of the claims process.

The McKinsey slides discuss ways to be more aggressive in attorney represented claims, including "greater use of liability investigation tools (statements, scene investigation) and damage verification tools (IMEs, photos, and medical management)"; taking advantage of "a large opportunity" in "general damage evaluation…especially in subjective injury, represented claims"[62]; recognizing "[m]any plaintiff attorneys yield to more aggressive tactics"[63] (meaning they settle for less with AIC than with other companies because AIC is much more aggressive in its resistance of payment on attorney represented claims).

### 3.  Claim Chronology Again.

It is with these strategies in mind that one must address the further handling of Mr. Tate's UM claim.  Picking up where we left off at March 5, 2009 it appears Murphy-Rhude conducted a "liability analysis" in which she indicated she had obtained the police report, reviewed the statement of Dolores Christian and information from the driver stopped at the Dollar General exit, concluding that, "based on investigation 100% adverse to claimant Christian"[64] (translated – Christian 100% at fault in causing accident).  The only apparent reason for this evaluation since, as yet, Murphy-Rhude was not handling the UM claim (and had already informed you that such a claim would be "split", i.e. assigned to another adjuster (see D-00077), was to determine if AIC had a potential subrogation claim against Dolores Christian if it made a payment to Tate, or whether Tate had any liability to Christian or the driver of the vehicle stopped in the Dollar General exit.  Because Tate is the "you" and thus the named insured in his policy, AIC by statute would have no right of subrogation against Christian and AIC, as her liability insurer, in the event it made a payment to Mr. Tate under his medical payments coverage (as it eventually did).[65]  Nevertheless, a notice of subrogation under the Tate medical payments

---

[60]C000003326.
[61]C000003328.
[62] General damages typically do not include out-of-pocket losses like medical bills and lost wages but do include subjective complaints of pain and suffering, permanent disability, and even disfigurement.
[63]C000003330.
[64] CHR 3/4/09 entry [D-0007677].
[65] 36 O.S. §6092, as construed in 1981 by the Oklahoma Supreme Court in <u>Aetna Cas. & Sur. Co. v. State Bd. for Prop. & Cas. Rates</u>, 637 P.2d 1251, 1255 (Okla. 1981).

November 1, 2010
Page 21

coverage was sent by Turkessa Keith on March 9, 2009 to AIC, her employer, acting as Christian's insurer.[66]

On March 4, 2009 the adjuster who handled Tate's UM claim until after this case was filed, Wendelyn W. Perceful, appears in the CHR for the first time.[67] Perceful testified she only worked UM claims in which the claimant is represented.[68] Sometime after this case was filed but before her 10/4/10 deposition, she was taken off UM claims entirely.[69] Perceful worked in AIC's Oklahoma City office.[70] Perceful first spoke to you on March 4, and you told her, as you had told Murphy-Rhude, that Tate sustained a concussion and was taken to the hospital. On the same day and on March 5, entries were made in the CHR by a Shanita Jackson and by Murphy-Rhude to the effect that the AIC adjuster handling claims under the Christian policy had accepted 100% liability for the accident.[71]

Perceful's notes indicate you sent an incomplete copy of a police report in a March 5 letter [D-00717] so she ordered a complete copy of the report. However, the report appears already to have been in the claim file because a 3/4/09 entry by Murphy-Rhude said "[r]evw of police report shows no liability or speed issues on our insured" [D-00076 – 77]. On March 18, 2009 Perceful returned a call you had made to her. Her note indicates you informed her, as you had previously informed Murphy-Rhude, that Mr. Tate was transported to the hospital by ambulance, had a concussion, and that he had problems with his neck, back and hands, had not worked since the accident, was scheduled for an MRI, and you did not know of any pre-existing conditions he had [D-00068].

On March 26, 2009 Perceful received a prior claims history on Mr. Tate from ISO which does not suggest any pre-existing injuries to areas of the body disclosed by you to her as having been injured in the accident.[72] The 28 page ISO report does identify many of the healthcare providers who had treated Mr. Tate for injuries in the accident with Christian.

A series of form letters were then sent by Perceful to you, some of which included unlimited medical authorizations. This was not the first or only time AIC submitted unlimited medical authorizations to you for Mr. Tate to sign.[73] The request for these unlimited authorizations was in clear violation of Oklahoma law. When a person is injured and makes a claim for the injury, he waives his privilege not to disclose his medical information created by 12 O.S. §2503, for the injuries at issue, but he does not give up the privilege for records unrelated to

---

[66] See 3/9/09 Keith letter [D-00721] and CHR entry of 3/9/09 [D-00069].
[67] CHR 3/4/09 entry [D-00075].
[68] Perceful depo. 14.
[69] Id. 15.
[70] Id. 16-17.
[71] CHR 3/4/09 and 3/5/09 entries [D-00073].
[72] See CHR 3/26/09 entry [D-00067]; ISO Claimssearch Match Report Summary [D-00612 et seq.].
[73] See 3/3/09 Keith-Luther letter [D-00730]; 3/12/09 Harrison-Luther letter [D-01708]; 3/3/09 Keith-Tate letter [D-00730]; 12/9/09 Perceful-Luther letter [D-00084]; 12/28/09 Perceful-Luther letter [D-00674].

November 1, 2010
Page 22

the injury at issue, unless there is reason to believe the injury preexisted the accident which the patient claims to have caused it.[74]    Perceful testified she did not know the "specific legal requirements" for AIC to obtain a medical authorization from a claimant.[75]

On April 8, 2009 a person named Moore made a CHR entry for "UM Alert Conference" which confirms again that Christian was at fault and AIC, as her insurer, had accepted responsibility for Tate's claims.[76]    On August 15, 2009 a Jimmie Harrison called you about the UM claim, and you advised, according to the CHR, that Mr. Tate was still under treatment, and you would send his bills and records once treatment was completed.[77]    You provided essentially the same information to Harrison on July 30, 2009, although you also advised Harrison that AIC had $100,000 in liability coverage under the Christian policy.[78]    Why an AIC representative handling Mr. Tate's claim did not already know what the Christian liability limit was is a mystery, particularly as one of the adjusters (Murphy-Rhude) had previously obtained a copy of the Christian statement from the adjuster handling claims under the Christian policy, as noted earlier.

On August 14, 2009 you advised Perceful that Mr. Tate was still under treatment, indicating his medical bills at that time were about $35,000, and an MRI had indicated he might be a candidate for back surgery, in which case his claim would become an underinsured motorist claim.[79]    On August 18, 2009 AIC did the first real reserve evaluation for Mr. Tate's UM claim, albeit without any documentation of medical treatment or lost wages.    Perceful established the total value of the claim at $89,000, of which "estimated" medical bills were $35,000, "estimated" future medical expense was $20,000, past and anticipated future wage loss was $9,000, and general damages were $25,000.[80]    Perceful testified the $20,000 estimated future medical was "an educated guess based on my experience and the information that I have been provided,"[81] as was her $25,000 general damages figure.[82]

Meanwhile, back on April 23, 2009 Mr. Tate had sued Christian in Case No. CJ-2009-889-L, District Court of Cleveland County, for damages caused by her negligent driving.[83]

---

[74] See Nitzel v. Jackson, 879 P.2d 1222, 1223 (Okla. 1994); Brown v. Blevins, 968 P.2d 1218 (Okla. 1998); Dobson v. Edwards, 958 P.2d 168 (Okla. 1998); Ellis v. Gurich, 73 P.2d 860 (Okla. 2003); Johnson v. Hathcock Truck Lines, 162 F.3d 1173 (Tab.), 1998 WL 717273 at *6 (10th Cir. Oct. 14, 1998); Fullbright v. State Farm Mut. Auto. Ins. Co., 2010 WL 274131 at *2 (W.D. Okla. Jan. 15, 2010); and Shreck v. North Am. Van Lines, Inc., 2006 WL 1720545 at *2 (N.D. Okla. June 19, 2006).
[75] Perceful depo. 77.
[76] CHR [D-00066].
[77] Id. 4/15/09 entry [D-00065].
[78] Id. 7/30/09 entry [D-00063].
[79] Id. 8/14/09 entry [D-00063].
[80] Id. 8/18/09 entry [D-00063].
[81] Perceful depo. 112.
[82] Id. 113.
[83] See [D-00610].

November 1, 2010
Page 23

AIC hired a lawyer to represent Christian. AIC has never made an offer on behalf of Christian to settle Tate's lawsuit even though AIC concluded in March 2009 that Christian was at fault, and she has not only $100,000 in auto liability coverage, but also an umbrella liability policy. To date the case has not even been set for trial. AIC, as Mr. Tate's UM insurer with notice of the filing of the lawsuit against Christian, is bound by any judgment in that case.[84] According to the CHR, Perceful checked OSCN on December 9, 2009 and determined for the first time that Tate had sued Christian on April 23, 2009, at which time she obtained a copy of the petition [D-00057]. Why she had not previously determined this from the AIC adjuster handling the claim under Christian's policy is unknown.

On October 26, 2009 Perceful spoke to you, and you advised her that Dr. Nees had recommended a diskogram[85] and back surgery. You advised her you were still collecting medical records and bills as Mr. Tate was still under treatment. Perceful inquired if you thought the claim was an "underinsured motorist" claim and you responded, according to her, that "if surgery UIM would come into play".[86] On October 30, 2009 there is a CHR entry [D-00062] indicating Perceful received your October 28, 2009 letter [D-00694]. This letter says a CD of Mr. Tate's medical bills and records related to the February 25, 2009 accident is enclosed, along with an August 10, 2009 office note of the surgeon, Dr. Nees [D-00400]. This note states Mr. Tate previously had three lumbar epidural injections to relieve his back pain, had returned to physical therapy thereafter for treatment of his neck and back (having had physical therapy prior to the injections), but that the "results are mixed". In his assessment Dr. Nees states Mr. Tate had obtained "significant relief" from his neck pain "but unfortunately his low back pain remains a significant problem". Dr. Nees presented Mr. Tate with two options, further conservative treatment to the back or a surgical fusion of the lower vertebraes in the back in order to relieve the pain complaints.

The CD you sent documents all of the prior medical treatment and bills, including the following: initial treatment in the emergency room of Norman Regional Hospital where Tate complained of shoulder pain according to the ICD9 code, in addition to numerous other areas of his body [D-00176]; March 20, 2009 MRI of the spine [D-00214 & 393]; physical therapy with Therapy In Motoin starting March 23, 2009 [D-00406]; lumber epidural injections by Dr. Stidham in April, May and June, 2009 [D-00284, 293, 300, 336, 370]; March 25, 2009 evaluation of spine by Dr. Plusquellec [D-00412]; April 7, 2009 first exam by Dr. Nees [D-00396]; June 9, 2009 exam by Dr. Nees [D-00394]; second physical therapy treatments starting June 15, 2009 [D-00420]; August 13, 2009 referral by Dr. Nees to Dr. Ewing for hand pain [D-00463]; August 4, 2009 office records of Dr. Ewing for examination of the hand [D-00514]. Your letter also confirms the known medical expenses to date were $36,820.58, Christian's

---

[84] Keel v. MFA Ins. Co., 553 P.2d 153, 158-59 (Okla. 1976).
[85] A surgical procedure to evaluate back pain, in which dye is injected into spinal disks and then either x-rayed or scanned via computerized tomography to see if the disks are damaged.
[86] CHR 7/30/09 entry [D-00062].

November 1, 2010
Page 24

liability coverage with AIC was $100,000, and "Mr. Tate's legally recoverable damages exceed the tort-feasor's limits....".

You also sent an October 29, 2009 letter to Perceful [D-00697] including a pay stub reflecting Mr. Tate's rate of pay at $13 per hour at Hansmeyer Plumbing & Heating, and a statement of his lost wages to date, calculated at 36 weeks multiplied by $507 a week.

Upon receipt of your October 28 and 29 letters, Perceful did a second reserve evaluation. Even though you had provided her with actual medical bills, she still included medical expenses in the column for "estimated" instead of "known", at $35,000, with projected medical still at $20,000, and past and projected lost wages at $18,252, and general damages still at $25,000, the same amount she had used in the initial reserve evaluation when she had absolutely no documentation of injuries. The total was $98,250, the same as the initial reserve evaluation Perceful made when she had no documentation of medical treatment or wage rate. Since this is $1,748 less than the amount of the AIC liability coverage for Christian, Perceful did not set a real reserve. This is because she did not evaluate the claim as having a value exceeding the $100,000 liability coverage limit of the Christian policy [D-00060 – 61].

Nothing was done by AIC after receipt of your October 28 and 29 letters and the reserve evaluation until Perceful sent you a November 10, 2009 letter [D-00696], indicating AIC is reviewing documents you had sent to her and that "be assured that we will evaluate the claim as quickly as possible once we have all the necessary information". What "necessary information" she wants is not identified in the letter. Nothing else is done by AIC in response to your October 28 and October 29 letters through November. On November 30, 2009 you wrote Perceful again [D-00699], confirming a conversation you had with her a couple of days after your previous letter in which she "indicated it may take 30 days to evaluate the documents provided". The CHR indicates Perceful did not read the letter until December 7, 2009.[87] You summarized the existing bills at $36,820.58 with estimated future costs for lumbar fusion surgery by Dr. Nees at $60,000-$75,000, and a wage loss to date "now exceeds $20,000". You also point out that under established law, <u>Burch v. Allstate Ins. Co.</u>, a UM insurer is required to offer the amount of its evaluation of a UM claim if that amount exceeds the liability coverage limit of the tortfeasor, here $100,000. You conclude the letter by stating that, given $56,820.58 in out-of-pocket losses, and projected future surgical expenses of $60,000-$75,000, the UM claim value exceeds the $100,000 of Christian's liability coverage, without any consideration of "general damages". You conclude the letter by stating "[t]here is no reason for Allstate to delay payment of Mr. Tate's claim."

The CHR indicates Perceful "[r]eviewed documents provided by insured's attorney" on December 9, 2009 [D-00055]. Perceful does not way which of the many actual documents and those on CD which you had furnished to her had been reviewed. She also had Tate's medical bills put into the Decision Point® Medical Expert™ software copyrighted by Mitchell

---

[87] CHR 12/7/09 entry [D-00699].

November 1, 2010
Page 25

Medical [D-00086 – 93]. The analysis essentially confirmed the bills AIC had were reasonable and necessary in the sum of $34,342. The actual charges were $34,718.79 so the software reduced the actual charges by $286.

        After her document review, Perceful's note indicates she called you to advise she needed a recorded statement from Mr. Tate, "verification from employer of lost income, verification from the medical provider that he was not able to work, and tax records at the least". At the time of this discussion AIC had documented that Mr. Tate had not worked since the accident and had a pay stub showing his rate of pay. AIC had not made a prior request for an interview or examination under oath of Mr. Tate. Nor had it requested records directly from Tate's employer. At no time previously had AIC requested Mr. Tate to sign a restricted medical authorization so it could obtain records and reports directly from his healthcare providers, including any report deemed necessary to determine if his injuries prevented him from working. As noted earlier, all medical authorizations sent by AIC were unrestricted and therefore improper. Even after her discussion with you, Perceful sent you another unrestricted authorization with a December 28, 2009 letter [D-00674].

        In a letter date December 9 Perceful requested the same records from you she had requested in her telephone conversation [D-00054]. On December 10 you emailed Perceful [D-000686] a statement of Tate's former employer, Hansmeyer, stating: "Greg Tate has not worked for Hansmeyer Plumbing & Heating since the date of his accident. His rate of pay at the time of the accident was $13.00" [D-00640 & 649]. In the same email you sent Tate's weekly pay stubs from Hansmeyer showing his gross and net pay from the middle of December 2008 through the last day he worked in February 2009 before the accident [D-00641 – 648 & 650 – 657].

        You also immediately arranged for Mr. Tate to give Perceful a recorded statement which occurred on December 11 [D-00762]. This statement and Perceful's summary of it [D-00051 – 52] restates what AIC already had been told concerning the trauma of the collision, Christian was at fault, Tate was employed by Hansmeyer but had not worked since the accident due to injuries in the accident, Tate had been treated by doctors whose records AIC had, and he had no prior injuries to the body parts injured in the accident. One new bit of information in the statement was that Mr. Tate had recently been referred to Dr. Bobb for shoulder pain, cracking and popping, and had seen Dr. Bobb on the Monday before the December 11 statement, at which time both of his shoulders were injected with steroids. Tate told Perceful that Dr. Bobb had scheduled him for an MRI of his shoulders on the Monday after the statement. AIC never asked Dr. Bobb for records, bills or a report, since it never acknowledged that it was not entitled to the unrestricted medical authorizations AIC sent you on several occasions.

        Purportedly concerned with Kenneth Hansmeyer's signed statement, on December 11 Perceful called him "to verify signature since the letter is not on letterhead", and Hansmeyer verified he signed the document [D-00051]. Hansmeyer also confirmed the other information in his statement, namely, that Tate was employed as of the accident date. Perceful also spoke to Hansmeyer's office manager who verified the same information.

November 1, 2010
Page 26

You sent Perceful a December 15, 2009 letter [D-00687] which she apparently read on December 17 [D-00051]. With this letter you transmitted records and bills of Drs. Stidham and Bobb, advised Perceful the incurred bills now total $37,531.58, and on the date of the letter Mr. Tate was having an MRI on his shoulders. You further stated that Mr. Tate's lost wages to date were $21,892.00, and the estimated cost of the surgical fusion recommended by Dr. Nees would be between $60,000-75,000. You concluded the letter by stating that "Mr. Tate's damages clearly exceed the tortfeasor's liability limits" and, "[u]nder these facts, Allstate is required to pay from the first dollar up to the policy limit".

According to Perceful's December 17 CHR entry, she also reviewed the medical records and bills she had previously been furnished and concluded "they do not medically document the claim for wage loss". However, she did not, at this or any other time, send you a restricted medical authorization with which she could have obtained a report from Tate's treating doctors concerning whether his time off from work was necessitated by injuries suffered in the motor vehicle accident. Nor did she ever evaluate the claim without any wage loss to determine if the value exceeds the $100,000 liability coverage. With $81,892 to $96,892 incurred and estimated future medical bills, AIC should have evaluated the claim at excess $100,000, without regard to lost income.

No action of any kind was taken by AIC on the claim after December 17 until December 28. On that date you talked to Perceful who requested "(1) proof that a physician told Mr. Tate not to return to work, (2) documentation that Dr. Nees has recommended surgery, and (3) documentation that the surgery will cost between $60,000 to $75,000". According to Perceful she would "need to get all documentation to support damages presented to complete the evaluation process".[88] Perceful also attempted to cover herself on December 28 by making an entry, stating she had made a request for several items of information in a December 9 letter, only some of which – recorded statement, verification from employer of lost income – had been provided. According to this entry the documentation which had not been provided was a medical/wage authorization, photos and estimates of damage to the Tate 1991 pickup, medical records from Dr. Ewing, bills and records from Dr. Carl, bills and records from Therapy in Motion from the August 13, 2009 referral, medical bills and records for any treatment prior to the accident, and "copies of documents produced in discovery in connection with the litigation arising from this accident" [translated, the case Tate had filed against the AIC insured Christian].[89]

On the same date Perceful received an email from you [D-00680] enclosing a collection notice Tate had received from Dr. Stidham. This notice states: "[i]f no payment is received within 10 days from the date of this letter, your account will be placed for collection"

---

[88] CHR 12/28/09 entry [D-00051].
[89] D-00050.

November 1, 2010
Page 27

[D-00682]. Your email also demands payment of the Tate UM coverage limit, $100,000, by December 31.

The CHR contains a December 28 Perceful entry headed "Evaluation" but the content is not an evaluation of the UM claim but Perceful's justification for why, after 10 months, AIC had not evaluated Tate's UM claim and either made an offer of payment or denied the claim. This is the same entry in which Perceful lists the documentation she does not have and needs. She sent you another letter also dated December 28 with another unrestricted medical authorization, requesting the same documents which you had discussed with her on that date [D-00672 – 676].

On December 19 you emailed Perceful [D-00669] a report from a certified disability management specialist, Lon Huff, which contains an estimate of the cost of the surgical fusion described by Dr. Nees at $70,000 to $90,000 [D-00094]. As it turns out, this estimate was much lower than the estimate from Dr. Nees himself, $150,000, as stated in his October 11, 2010 letter to you. In the same December 29 email you calculated the current past medical expense at $38,000, a maximum of $90,000 for anticipated future surgery expense, and past loss of wage income of $23,000, totaling $151,000 without consideration of any "general damages". Thus, the out-of-pocket damages which had been documented exceeded Christian's liability coverage by $51,000. On this basis you again demanded payment of the $100,000 UM limit by the next day.

According to the CHR Perceful reviewed your December 29 email on December 30 [D-00050] and then makes an entry described as "Policy Limit/Time Limit Demand Alert Conference" which she sends to a Sara Dang in the absence of another supervisor named David. In the entry Perceful again justifies AIC's failure to evaluate Tate's claim or make an offer or deny it on the absence of documentation, this time photos and an estimate of damage to Tate's 18 year old pickup. These items had never been requested prior to December 28, even though Tate had made a claim against Christian, which included total loss of his pickup. Any adjuster working Tate's UM claim could have requested photos of the pickup and any estimate of repair (the pickup actually was totaled) from either the AIC adjuster handling Tate's claim under Christian's policy or the lawyer representing Christian in Tate's case against her. There is no evidence Perceful or anyone else ever asked the liability adjuster or Christian's lawyer for any information, other than Murphy-Rhude who reviewed Christian's statement and was told by the liability adjuster what the driver of the vehicle at the Dollar General exit said.

Perceful's December 30 note also states the report of Lon Huff and the pay stubs from Hansmeyer Plumbing & Heating, along with the signed statement of Kenneth Hansmeyer and the verbal interview she had of him, were insufficient to support Huff's estimate of the cost of future back surgery, and $23,000 in past lost wages. As a result, Perceful did not establish any new "gross value" for Mr. Tate's claim, even though, since her last evaluation of his claim on November 3, a value of $98,252, AIC knew Tate continued not to work, had received bills from Drs. Stidham and Bobb, and Huff's estimate of the cost of future back surgery. The bills of Drs.

November 1, 2010
Page 28

Stidham and Bobb alone would, when added to Perceful's November 3 "Gross Value" of $98,252, would put her valuation of the claim over the Christian $100,000 liability coverage, thereby triggering AIC's duty to pay the $100,000 UM coverage limit.

On December 31 Dang, Perceful's supervisor, stated that she agreed that additional documentation was needed [D-00049]. On the same day, New Year's Eve, you spoke with Perceful. Her entry regarding this conversation presents AIC in the best light possible in order to excuse its failure to evaluate Tate's claim and either make an offer of payment or deny it. According to the entry you informed her that you did not have an estimate of damage to a totaled 1991 pickup but she had your permission to check with the liability adjuster to see if AIC had such an estimate or photos of Tate's pickup. Actually, AIC didn't need your or Tate's permission to obtain information from the file for the claim against Christian. What would have been needed was Christian's permission to AIC to disclose information from the liability file to the UM adjuster. This is whose permission the liability adjuster obtained back in March to share Christian's statement with the original UM adjuster.

With regard to the collection notice from Dr. Stidham, Perceful states she "expressed empathy" but she didn't offer to do anything, such as make an advance payment on Tate's claim so he could pay Dr. Stidham. Advanced payment is a procedure with which Perceful was familiar, and is made "when a person notifies us that they're having financial hardship, and we know that we're going to owe them that part of the claim".[90]

Perceful also emailed you on December 31 [D-00666] with her list of documents needed and previously described. This was later sent in letter form. She states that AIC has "reviewed the information you submitted and we feel that additional information is necessary for us to properly evaluate and consider the demands made by you", and concludes with the following curious statement:

> Please let us know if there is any reason why you are unable to cooperate with our investigation or are otherwise unable to provide the requested information, please advise in writing why you are unable or unwilling to do so.

This is the first indication after more than 10 months of an open claim that AIC was accusing you, as the lawyer for its insured, of not cooperating with AIC. The statement is a blatant misrepresentation of the facts. You had provided a mountain of documents to AIC since your first contact with it on behalf of Mr. Tate, obtained a signed statement from his employer confirming his employment and that he had not worked since the accident, and immediately made Mr. Tate available for a recorded statement when AIC finally decided it needed to be taken. You also provided AIC with a report concerning estimated future back surgery costs. In view of what you had done, the only explanation for the accusation of lack of cooperation is to provide evidence to excuse what AIC should have but had not done.

---

[90] Perceful depo. 115.

November 1, 2010
Page 29

You did respond to the email and letter later on New Year's Eve via email [D-00658]. Because I believe your response to have been proper, I quote it here at length:

In your email of 2:39 p.m., Allstate requests a written explanation why we are "unwilling or unable" to "cooperate" with Allstate's investigation of Mr. Tate's UM claim. Please note that to date, Mr. Tate has provided Allstate with a recorded statement, 480 pages of documentation in support of his claim, and several extensions of time. Allstate cannot fairly characterize Mr. Tate's actions as an unwillingness to cooperate.

This correspondence also confirms our telephone call of earlier today, prior to your email. I have reviewed the file in light of the December 9, 2009 request for records that you referenced. According to your statements, Allstate needs all of the information requested in the December 9 letter in order to evaluate Mr. Tate's UM claim. I will address each of the 12 items requested individually.

1. A recorded statement from Mr. Tate concerning the accident and his injuries. **Response:** Mr. Tate was presented on December 11 for a complete recorded statement that you took on behalf of Allstate.

2. Copies of photos and the estimate of damage to Mr. Tate's vehicle. **Response:** As I explained, we do not have copies of the estimate because the truck was totaled. As you know, Allstate also insures the lady that caused this accident. You also know that Allstate has not paid Mr. Tate for the damage to his truck. Allstate is now in possession of the truck because Allstate threatened to stop paying storage fees if Mr. Tate would not sign the title over to Allstate. I have spoken with Mr. Tate and obtained permission for you to get the photos and estimate in Allstate's possession....

3. Complete medical bills and records from Dr. Ellis. **Response:** As Mr. Tate explained in his recorded statement, Dr. Ellis has treated Mr. Tate for anxiety [both associated with his divorce before the collision and after]. However, Mr. Tate is not presently making a claim for his anxiety associated with this accident. Therefore, Allstate is not entitled to these records or bills. *Nitzel v. Jackson*, 1994 OK 49. Since Mr. Tate has not claimed emotional damage, Allstate has no business snooping through his medical records for treatment of anxiety. The attempt to do so is a bold and flagrant violation of the duty of good faith and fair dealing.

4. Complete medical records from Dr. Tom Ewing. **Response:** Provided on October 28, 2009 as "Oklahoma Orthopedic Institute" records.

November 1, 2010
Page 30

5.  Complete medical records and bills from Dr. Carl. **Response:** Mr. Tate was referred to Dr. Cark for a diskogram. However, this procedure has been postponed until immediately prior to the spinal fusion surgery. Mr. Tate's spinal fusion surgery is being delayed because he has no way to pay for it since Allstate has not paid his claim.

6.  Medical bills and records from Therapy in Motion resulting from the August 13, 2009 referral. **Response:** These records were provided to Allstate on October 28, 2009, weeks prior to the December 9 request. Thus, it appears that Allstate had not even reviewed all of the documentation submitted in support of Mr. Tate's claim.

7.  Complete medical records for the five years prior to the accident. **Response:** Allstate has been provided with all of the medical records of Mr. Tate's injuries related to this accident. These records clearly indicate that Mr. Tate was completely healthy prior to the wreck. There is absolutely no suggestion that he needed a spinal fusion surgery prior to the wreck. Allstate is clearly on a fishing expedition to try to find a reason not to pay him. You indicated that Allstate does not have enough information to determine whether Mr. Tate's injuries were caused by this accident. In order to take this position, Allstate must disregard all of the statements by Mr. Tate's physicians in the medical records provided, and determine that Mr. Tate is a liar and somehow managed to work as a heat and air installer while hiding his need for a spinal fusion surgery.... Mr. Tate's complete medical records for the previous five years are none of Allstate's business and are legally protected by the physician/patient privilege. Just because Mr. Tate was hurt and made a claim, it does not allow Allstate to see any and all medical records. Read *Nitzel v. Jackson*, supra. You indicated that Allstate takes the position that Mr. Tate is required to sign an authorization allowing complete access to Mr. Tate's medical records. That position is deplorable. Please read the *Nitzel* opinion for an easy correction to Allstate's position.

8.  Verification from Mr. Tate's employer of his time missed from work and the salary at the time of the accident. **Response:** This documentation was provided to Allstate on December 11, 2009, two days after it was requested.

9.  Verification from Mr. Tate's physician that he was not able to work for the stated time frame. **Response:** No such verification exists, and thus, we cannot provide it to Allstate. In his recorded statement, Mr. Tate told Allstate that his physicians informed him not to lift more than 10 pounds. Most everything that he must lift to perform his job weighs more than 10 pounds. As I explained earlier, Mr. Tate needs a spinal fusion surgery and cannot

November 1, 2010
Page 31

return to his job as a heat and air installer. If Allstate believes that it has valid
evidence that Mr. Tate could return to work, please identify it to me.

10. Tax records for the past three years. **Response:** Mr. Tate's tax records are
confidential. Just because he was hurt and made a claim does not give
Allstate any basis to snoop through his tax records. His claim is for lost
income. We have provided more than enough documentation of his lost
income. Delaying and/or refusing to pay Mr. Tate's claim until Mr. Tate will
allow Allstate to wrongfully invade his privacy is perhaps the most flagrant
violation of the duty of good faith and fair dealing I have witnessed in some
time....

11. Copies of medical bills and records that were not provided with the settlement
demand. **Response:** Again, these documents were provided to Allstate on
October 28, 2009, weeks prior to the December 9 request.

12. Any documents produced in connection with the litigation arising from this
accident. **Response:** Again, produced on October 28 and December 11.

In addition to the items listed in Allstate's December 9 requests, Allstate
requested documentation of the spinal fusion surgery estimated expense of
$60,000 - $75,000. We employed a rehabilitation specialist to perform the
estimate. The rehabilitation specialist's estimate was $70,000 - $90,000. This
documentation was provided to Allstate yesterday. In our phone conversation
today, you informed me that Allstate still needs documentation of the cost of the
surgery. We cannot...provide Allstate with anything else. If Allstate has some
evidence that the rehabilitation specialist's estimate is not reliable, please provide
it to me.

During our phone conversation, you also indicated that Allstate UM only owes
Mr. Tate the value that his claim exceeds the amount of insurance of the lady that
caused the accident. That is incorrect and should be widespread knowledge in
Allstate's claim department following the Supreme Court's 1998 opinion in *Burch
v. Allstate*, 1998 OK 129. In *Burch*, Allstate took the position that the insured had
not provided Allstate with sufficient information to pay the claim. After years of
litigation, Allstate only paid the amount but the claimant's claim exceed the
liability coverage. The Supreme Court made it clear that Allstate owed from the
first dollar, up to the policy limits. Please check with Allstate's legal counsel for
verification.

The last substantive action Perceful took on the claim was to send you a December 31
letter [D-00667] which is identical in substance to the December 31 email to you. This case was
filed on January 6, 2010. At the time of filing there is no evidence that any offer had ever been

November 1, 2010
Page 32

made to Mr. Tate under his UM coverage or under Christian's liability coverage; no evidence that AIC had changed the "gross value" of Tate's claim from the previous $98,252.00, $1,748.01 less than is necessary under Oklahoma law to have required Allstate to pay the $100,000.00 UM limit to him[91]; and no evidence that AIC continued to investigate or evaluate the claim. Perceful did send you a January 8, 2010 letter which states: "in preparing to respond to your [December 31] e-mail, it has come to my attention that you have filed suit against Allstate for this claim. Consequently, further discussions regarding the information we need to complete our evaluation of Mr. Tate's claim will be through our attorneys since suit has been filed."[92]

Despite advising you that "the information we need to complete our evaluation...will be through our attorneys", Perceful continued to be assigned to Tate's claim until August 2010, at which time she was moved to non-UM auto claims, and replaced by another adjuster whose name she did not recall in her deposition.[93] However, during the time span from the filing of this case to her removal from the Tate file in August, Perceful could not recall receiving or even being aware of the information AIC has been obtaining through formal discovery in this case, or of the fact AIC's lawyers submitted a restricted medical authorization which Mr. Tate has signed.[94] I have not been provided with any evidence that AIC has continued to investigate or evaluate Mr. Tate's UM claim since the case was filed, as required by the continuing duty of good faith and fair dealing, or that AIC has ever decided that Christian's motor vehicle is an "uninsured motor vehicle", or that AIC has ever made an offer to Mr. Tate.

In October of this year you received letters from Drs. Bobb and Nees, the surgeons who have examined Mr. Tate's shoulders and back, respectively. Dr. Bobb's October 5 letter states, as did his bills you furnished AIC on December 9, 2009, that he first saw Mr. Tate on December 7, 2009. This visit was for complaints of bilateral shoulder pain which had progressively worsened since the February 25, 2009 collision. Dr. Bobb performed a arthroscopy on the left shoulder on August 6, 2010, and anticipates a similar surgery will be required on the right shoulder. Dr. Bobb's letter concludes: "It is certainly felt by me that his shoulder problems are causally related to his motor vehicle accident. This is certainly more probable than not. I also feel that bills to date have been reasonable and necessary." The letter states that Dr. Bobb's bills (actually the bills of Orthopedic & Sports Medicine Center with which he is associated) are $10,197; the non-surgeon charges for the left shoulder surgery are $22,640; and physical therapy to the left shoulder after surgery is $1,973. Dr. Bobb states "we could expect a similar degree of charges for the right shoulder" if Mr. Tate agrees to the operation. Adding the figures in Dr. Bobb's letter, the total incurred medical for his treatment and surgery of Mr. Tate is $34,810, and he estimates another $34,810 in the event of right shoulder surgery, at total of $69,620.

---

[91] A law which, in her deposition, but not in her conversation with you on December 31, she acknowledged she knew. See Perceful depo. at 56.
[92] This letter is not in the copy of the claim file I received but was furnished to me by you.
[93] Perceful depo. 189.
[94] *Id.* 190-91.

November 1, 2010
Page 33

Dr. Nees' October 11 letter states he saw Mr. Tate initially on April 9, 2009 for complaints of back and neck pain sustained in the February 25, 2009 collision, and that conservative treatment was provided with "fairly good control of his neck problems". However, this treatment did not relieve the back pain so Dr. Nees provided Tate with the option of a pain management referral or a surgical fusion. In December 2009 Mr. Tate elected for the pain management referral and declined the surgery for now. Dr. Nees stated that if the surgery is performed, the cost, including post-surgical physical therapy, "will be roughly $180,000". Dr. Nees also states that:

> it is very clear from a chronological standpoint that the patient did not seem to have spinal problems in his neck and low back before the accident but did afterwards. The neck got better but the low back did not. Objective evidence suggests damage to the L4-5 and L5-S1 discs. I believe with a reasonable degree of medical certainty that the damage seen to the 2 lowest discs in Mr. Tate's back were caused by the accident on February 25, 2009 and feel that if he has to proceed with further intervention in [sic] is low back, it will be because of this accident.

You have advised me that as of October of this year Mr. Tate's incurred medical expenses are $76,722.58. The reports of Drs. Bobb and Nees support an estimated cost for future right shoulder and back surgery totaling $184,810. Mr. Tate has not returned to work. Using his pay stubs from February 2008 to February 2009, as you have done, you have informed me that Mr. Tate worked an average of 21.48 hours per week for Hansmeyer Plumbing & Heating at $13 per hour. As of October 15, 2010 Mr. Tate had missed 81 weeks of work, making his lost wages as of that date $22,618.44. Thus, the actual out-of-pocket lost by Mr. Tate as a result of the motor vehicle collision, both incurred and future, is $284,151.02, without regard for any "general damages".

**D. Violation Of Legal, Industry And Internal Standards By AIC In The Handling Of Greg Tate's UM Claim.**

AIC violated multiple standards for claims handling established by law, industry norms and practice, the Tate Policy, and AIC's own claims handling guidelines. AIC's handling of Mr. Tate's claim is consistent with the unofficial strategies for handling BI claims of persons, including insureds, who chose to hire a lawyer to assist them, as summarized in the McKinsey slides.

1. AIC violated legal and industry standards by failing to use the investigative tools made available to it in the Tate Policy to address AIC's professed concerns that it did not have sufficient information to evaluate Tate's claim. The Policy authorized AIC to obtain a medical authorization. AIC repeatedly sent you unrestricted medical authorizations which AIC is not entitled to have under Oklahoma law, and never sent you a restricted authorization which would

November 1, 2010
Page 34

have allowed AIC adjusters, for example, to request an estimate of the cost of future surgery by Dr. Nees, obtain more records from the shoulder surgeon Dr. Bobb, and request opinions of any and all treating doctors concerning causation of Tate's injuries, reasonableness and necessity of his treatment, and whether and to what extent he is permanently disabled.

AIC also did not utilize a medical examination by a physician of its choice as authorized by the Tate Policy to address any of its professed concerns concerning Mr. Tate's medical condition. AIC has belatedly in this case obtained such an examination but the opinions of the physician conducting that examination were not available to AIC at the time it was claiming to have insufficient information with which to evaluate this claim and thus constructively denied Tate's claim. Consequently, the physician's opinions obtained in this case may not be relied upon by AIC.[95]

AIC failed to request information available to it from the liability claim file created by AIC with respect to claims made against Christian by Tate, even though the initial adjuster on Tate's UM claim had obtained information concerning Christian's statement. AIC could have requested an estimate (if there is any) of repairs to Tate's 18 year old pickup (even though the collision resulted in a constructive total loss) and photos showing impact damage from the collision, from the liability adjuster. There is nothing wrong with utilizing factual information lawfully obtained from any source, including a liability insurer, provided the UM insurer independently evaluates the significance of the information.

2. The failure to utilize the tools available to AIC under the Tate Policy and within its own organization (request for information to the liability adjuster) caused AIC to violate its *Guiding Principles Relating to Auto Claims* which require a "diligent search for the facts as promptly as possible". AIC could have obtained the answers to its professed concerns from Mr. Tate's doctors once it knew who they were, but instead attempted to shift the burden to you as Mr. Tate's legal representative, to do AIC's job. This violated another of the *Guiding Principles Relating to Auto Claims* which states: "We do things right the first time, and in the manner that best serves the needs of our customers" [D-00813].

3. The repeated request for Mr. Tate to sign unrestricted medical authorizations violated Oklahoma law in the absence of any information available to AIC that Mr. Tate's neck, back and shoulders were already injured or diseased before the February 25, 2009 collision. Because the law sets the parameters for the duty of good faith and fair dealing, along with industry and internal insurer standards, the repeated requests for unlimited medical authorizations violated the duty of good faith and fair dealing owed to Mr. Tate.

---

[95] *See e.g.*, Newport v. USAA, 11 P.3d at 199-200 (Okla. 2000) (deposition of treating doctor of insured taken by UM insurer in case against it was inadmissible to prove the cause of the insured's death was not his injuries in a motor vehicle accident, because the doctor's opinion "was not [sic] relative to the issue of USAA's belief at the time it evaluated the Newport claim").

November 1, 2010
Page 35

4. AIC violated the legal and industry standards, including 36 O.S. §1250.5(4), by failing to timely evaluate Mr. Tate's claim. AIC had sufficient information to determine Mr. Tate's claim had a value exceeding the $100,000 liability coverage limit upon receipt of healthcare provider records and bills, and documentation of his employment and his hourly rate of pay in late October 2009. Indeed, both before and after receipt of documents from you at the end of October, AIC put a "Gross Value" on Tate's bodily injury claim of $98,252, only $1,748.01 less than the sum which would have triggered AIC's duty to pay, on a "first dollar" basis, the $100,000 UM coverage limit. No one, in good faith, can predict the value of a bodily injury claim of any size as a specific amount, and within a range of $1,748.01. Industry practice typically is for claims personnel to develop a range of values for bodily injury claims, in recognition of the known fact that these evaluations are but subjective estimates of the claims personnel. AIC did not use a range of values. If it had, the range at any point from the first "Gross Value" evaluation to today would clearly have exceeded $100,000, thereby triggering AIC's duty to pay Mr. Tate $100,000 in UM coverage.

Evaluations also are not static. AIC put a "Gross Value" on the Tate claim on at least three occasions, although the value never changed from the initial evaluation when AIC had little or no documentation of damages, to the end of December, 2009, when it had significant documentation. Even assuming a $98,252 "Gross Value" was within a reasonable range, based upon review of documentation AIC had at the end of October, 2009, by December the additional medical bills alone which AIC had, considered in light of the recorded statement of Mr. Tate taken in December, reasonably would have increased the "Gross Value" above $100,000. AIC's failure to adjust its evaluation of the "Gross Value" of Mr. Tate's claim to account for additional information it received is contrary to industry standards.

5. AIC violated and continues to violate the duty of good faith and fair dealing and industry standards by not continuing to evaluate Mr. Tate's claim after he filed suit. Perceful's January 8, 2010 letter to you and her deposition clearly indicate she did nothing on the claim after suit was filed, leaving it to AIC's lawyers. Because she did nothing, she testified she could not even recall receiving any of the extensive discovery materials produced in this case (most of which AIC already had).

In this case AIC has been provided with the letter report of Dr. Bobb who opines Tate's shoulder injuries were caused by the February 25, 2009 collision, and that the surgery on the left shoulder as well as any future surgery on the right shoulder are necessitated as a result of such injuries. AIC also knows Dr. Nees, the orthopedic treating Tate's neck and back complaints, relates them to the same motor vehicle accident, and has recommended a spinal fusion to relieve Mr. Tate's pain complaints. Together the incurred and estimated future expenses of surgery on the shoulders and back is $184,810, a sum which alone triggers AIC's duty to pay the $100,000 UM limit. Moreover, as of the middle of this month, the total incurred in future medical expenses appear to be $284,181.02, 2.8 times more, without considering any "general damages", than the sum which is necessary to trigger AIC's obligation to pay Mr. Tate

November 1, 2010
Page 36

the UM limit. Yet, this information has not caused AIC to pay the $100,000 UM limit, as it should do if acting in good faith.

6. AIC manipulated the "Gross Value" of Tate's claim by estimating his "general damages" unreasonably low, $25,000, and never changing this number. General damages include the pain caused by an injury or treatment of the injury. The medical records document Mr. Tate has experienced constant pain since the collision on February 25, 2009, and has undergone a significant amount of conservative treatment to minimize or eliminate that pain, as well as left shoulder surgery. Given the nature and duration of his complaints, the actual and recommended surgery to address the complaints after unsuccessful conservative treatment, it is unreasonable to value Mr. Tate's pain and suffering at a specific sum of $15,000. In effect, this number was manipulated to keep the "Gross Value" of the claim below what AIC claims procedure says is **"very important"** - "to know under what circumstances a UIM BI exposure is 'triggered'". See *Coverage Reserving* [D-00800].

AIC also violated industry standards by failing to document the basis upon which it arrived at the $25,000 general damage estimate. As previously discussed, proper documentation in a file, particularly of liability and damage evaluations, is both an industry standard and meaningful for a variety of reasons.

7. AIC improperly manipulated its duty to timely and properly investigate and evaluate Tate's claim by shifting the burden of investigation onto Mr. Tate and you, as his legal representative. This strategy was implemented with numerous form letters which say the same thing, require improper unlimited medical authorizations, and misrepresent whether and to what extent you had provided information to AIC. This strategy also included repeated statements made by Perceful that all of the information you had provided AIC was insufficient to determine if the AIC "Gross Value" number of $98,252 should be increased by at least $1,748.01, the amount necessary to trigger AIC's duty to pay Mr. Tate $100,000 in UM coverage.

The repeated requests for information AIC could have obtained directly from healthcare providers with a restricted medical authorization, and for an estimate of repairs of an 18 year old pickup and photos of it, available from another AIC employee, are examples. Instead of seeking this information, Perceful, for example, called Mr. Hansmeyer, Tate's employer, purportedly to verify his signature on the statement he had previously given, on the thought that perhaps the signature was not genuine because the statement was not on "letterhead".

Another example of this strategy was the requesting of specific records when AIC already had them, provided by you. This was pointed out by you on more than one occasion, the last time in your December 31, 2009 email. The refusal to schedule a medical examination of Mr. Tate if AIC truly was concerned about whether his injuries were caused by the collision, the reasonableness and necessity of the treatment he had, and whether and to what extent he had permanent disability, is another example. Instead of scheduling such an examination, and not

November 1, 2010
Page 37

directly requesting reports from the treating doctors, AIC repeatedly told you it did not have sufficient information to evaluate Mr. Tate's claim, and then repeatedly sent you medical authorizations which any competent lawyer would not allow his client to sign. This strategy also violates AIC's "official" claims handling standard of "'Leave it to us', We minimize forms and keep procedures simple", and we "do things right the first time, and in the manner that best serves the needs of our customers", which would include Mr. Tate [D-00813].

8. AIC violated its internal claims handling standards described by Perceful in her deposition by failing to make an advance payment to Mr. Tate to head off collection action by his healthcare providers. While advance payment is not contractually required by the Tate Policy, it is, according to Perceful, a tactic which AIC employs. It is also common in the insurance industry. The basic idea behind it is to demonstrate good faith to a claimant and thereby gain the trust of the claimant which, in turn, may cause the claimant to believe he or she does not need a lawyer, and to settle his claim for less than he or she might otherwise do.

If AIC is to have such a procedure available as a claims handling tool, its conduct should be measured in light of it. When you provided Perceful from the collection notice from Dr. Stidham, the advance payment option should have been employed. However, as discussed in the next subsection, an advance payment is totally inconsistent with AIC's unofficial strategy for handling claims of represented claimants, including AIC insureds.

9. All of the conduct described in subsections 1-8 is a violation of the duty of good faith and fair dealing, and is clear evidence AIC treated Mr. Tate the same as the AIC liability adjuster and defense lawyer in Tate's lawsuit against Christian have treated Mr. Tate. AIC has made no settlement offer under the liability coverage, just as AIC has made no offer under the UM coverage. AIC's handling of the UM claim is, therefore, the same adversarial approach which it has taken in defense of Mr. Tate's claim and lawsuit against Christian, a violation of the duty of good faith and fair dealing.

All of AIC's conduct described in subsections 1-8 is, however, consistent with the strategies for handling claims of represented claimants, including AIC insureds, described in the McKinsey slides. "Let it sit", delay, repeated and unnecessary requests for information, and lack of negotiation are all integral to this strategy, its purpose being to discourage claimants, cause them to accept less money while in dire straights, or else go to court and wait years to receive any money. These tactics are used because AIC intends to "win the economics game" over its insured. Lest any AIC employee fail to get this message, the McKinsey slides sum up AIC's approach – "winning is a zero sum game". Utilization of this strategy violates the official AIC claims handling procedures which mandate that AIC "[c]onclude each claim, large or small, on the basis of its own merits, in the light of the facts, the law and the coverages afforded". See *Guiding Principles Relating to Auto Personal Claims* [D-00799].

The strategy illustrated by AIC's handling of Mr. Tate's claim is consistent with the broader strategy for handling the claims of represented claimants. This strategy makes a

November 1, 2010
Page 38

mockery of AIC's official *Customer Service Policy* which is "to insure 'Peace of Mind' for customers who have had an accident or other loss" [D-00813]. Indeed, in view of the strategy evidenced by the McKinsey slides, "Peace of Mind" is a blatant misrepresentation. Minimizing payments to represented insureds to whom AIC owes a duty of good faith and fair dealing, including a duty not to treat an insured like Mr. Tate as an adversary, is completely consistent with the goals of the strategies outlined in the McKinsey slides – minimizing payment to represented claimants, including insureds ("win the economics game"), and thus increasing value of AIC to its shareholders.

Because AIC's represented claimant strategy is conscious and intentional, AIC's multiple violations of legal, industry and its own official internal standards, is not merely negligent or even grossly negligent. Rather, the treatment of Mr. Tate by AIC is an intentional breach of the duty of good faith and fair dealing, and an intentional violation of AIC's official claims handling procedures which are intended to ensure that AIC will "do things right the first time and in the manner that best serves the needs of our customers", and violates AIC's most public promise – "to ensure 'Peace of Mind' for customers who have an accident or other loss".

10. Had AIC done what it should, and not done what it should not as described in subsections 1-9, it would have paid Mr. Tate $100,000 upon review of the documentation you provided on October 28 and 29, 2009. At the worst, AIC would have made this payment by the first part of December, 2009. But, even today, November 1, 2010, AIC has not paid Mr. Tate a dollar, much less the $100,000 in UM coverage for which he paid a premium. In sum, this failure to pay Mr. Tate is an ongoing intentional violation of the duty of good faith and fair dealing owed by AIC to him.

Very truly yours,

Mort G. Welch

MGW:vm